**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

| | |
|---|---|
| **In re** : | |
| : | **OPINION AND ORDER** |
| **ADELPHIA COMMUNICATIONS** : | |
| **CORPORATION, et al.,** : | **Chapter 11** |
| : | **No. 02-41729** |
| **Debtors,** : | **Jointly Administered** |
| : | |

-------------------------------------------------------X

| | |
|---|---|
| **ACC BONDHOLDER GROUP,** : | |
| : | |
| **Appellants,** : | **07 Civ. 1172 (SAS)** |
| : | |
| **- against -** : | |
| : | |
| **ADELPHIA COMMUNICATIONS** : | |
| **CORPORATION, et al.,** : | |
| : | |
| **Appellees.** : | |
| : | |

-------------------------------------------------------X

... COURT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/2/07

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

The present dispute arises out of the approximately 230 jointly

administered chapter 11 cases of Adelphia Communications Corporation ("ACC")

and its subsidiaries (collectively, the "Debtors").  The ACC Bondholder Group[1]

---

[1]     The ACC Bondholder Group is comprised of holders and/or
investment advisors to certain holders of over one billion dollars of notes and
debentures issued by the parent company, ACC, in the aggregate principal amount
of $4.9 billion (or $5.1 billion including prepetition accrued interest), namely:
Aurelius Capital Management, LP, Banc of America Securities LLC, Catalyst
Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC,

appeals from the Bankruptcy Court's confirmation order (the "Confirmation

Order") approving the First Modified Fifth Amended Joint Chapter 11 Plan (the

"Plan").[2]  On January 24, 2007, the Court granted a stay pending appeal, which it

then vacated on February 12, 2007 due to Appellants' failure to post a reasonable

bond, thereby permitting the Plan to go effective.[3]  Nonetheless, Appellants are

seeking to pursue their appeal.  In light of the fact that the Plan has become

effective, the Court requested that the parties separately brief the issue of equitable

mootness.  For the reasons discussed below, I conclude that this appeal must be

dismissed on equitable mootness grounds.  As a result, I will not address the

merits of the appeal.

## I.    BACKGROUND

This Opinion assumes familiarity with the facts summarized in the

Bankruptcy Court's January 3, 2007 Bench Decision as well as this Court's

---

Drawbridge Special Opportunities Advisors LLC, Elliott Associates, LP, Farallon
Capital Management L.L.C, Lehman Brothers, Inc. (Global Principal Strategies
Business), Noonday Asset Management L.P., Perry Capital LLC, and Viking
Global Investors LP (collectively, the "ACC Bondholder Group" or "Appellants").

[2]    *See* Bench Decision on Confirmation, dated January 3, 2007 ("Bench
Dec.").

[3]    *See In re Adelphia Commc'ns Corp.*, No. M47, 2007 WL 186796
(S.D.N.Y. Jan. 24, 2007) (granting the stay subject to the posting of a bond),
*appeal dismissed*, No. 07-0279-bk (2d Cir. Feb. 9, 2007).

-2-

Opinion and Order granting the stay pending appeal (the "Stay Opinion").[4]
Additional facts and procedural history relevant to this Opinion are set forth
below.

On January 24, 2007, in a separate proceeding on an application for a
stay of the Bankruptcy Court order pending appeal, this Court granted a stay that
prevented the Plan from going effective during the pendency of the appeal. The
Court conditioned that stay on the requirement that Appellants post a substantial
bond. The Court set that bond at $1.3 billion after taking into account the
estimated harms that Appellees stood to suffer during the appeal. The bond was to
be posted in full within seventy-two hours following the date of the Stay Opinion.
Appellants chose not to post that bond. Instead, Appellants sought an interim
"one-judge" stay from the Second Circuit in order to appeal this Court's bond
requirement. Appellees did not appeal the grant of the stay. The "one-judge" stay
was entered, preserving the status quo without Appellants posting any bond.

Before the Second Circuit, Appellants argued that this Court's
granting of the stay only on condition that a substantial bond be posted was, in
effect, a denial of the stay. Crucially, however, Appellants did not (and could not)

---

    [4]     Terms used but not defined herein shall have the same meaning
ascribed to them in the Stay Opinion.

-3-

claim that they were *unable* to post that amount. Rather, their position was that

the posting of a bond in that amount would be an imprudent business decision for

their clients. Because it did not find that Appellants were incapable of posting a

bond, which would have meant that the imposition of a bond amounted to a denial

of a stay, the Second Circuit dismissed the appeal for lack of jurisdiction.

However, in the Second Circuit's decision, the court stated that the ACC

Bondholder Group was not precluded from

> returning to the District Court to seek modification of the bond
> amount (a) if it can show that it is in fact unable (rather than
> unwilling) to post the required amount or (b) to present
> alternative arrangements for the District Court's consideration
> that might lessen the amount of harm likely to be suffered by the
> Appellees in the event of an unsuccessful appeal, thereby perhaps
> justifying a reduction in the amount of the bond.[5]

Appellants did indeed return to this Court to obtain a modification of the bond, but

only under the second alternative posed by the Second Circuit. During the hearing

on the modification issue, Appellants persistently refused to post a bond greater

than $10 million.[6] Because such a small bond was unacceptable to the Court in

---

[5]    *In re Adelphia Commc'ns Corp.*, slip op. at 4 (2d Cir. Feb. 9, 2007).

[6]    Indeed, the Court attempted to facilitate the modification hearing by
suggesting several alternative bond amounts, all of which Appellants declined.
*See* February 12, 2007 Hearing Transcript ("2/12/07 Tr.") at 30 ("[Appellants can]
be the holdback. Go ahead and hold back your 900 million [dollar distribution
under the Plan] or a reasonable portion of it . . . ."), 45 (suggesting a bond

light of the magnitude of threatened harm to Appellees, the Court vacated the stay.

The Plan went effective immediately after the Court vacated the stay. On the Effective date, the Debtors commenced distributions under the Plan. Pursuant to the Plan, over $6.49 billion in cash has been distributed to more than 8,000 holders of Allowed Claims (as defined in the Plan); approximately 117,789,000 freely tradeable shares of Time Warner Cable ("TWC") Class A Common Stock has been distributed to approximately 13,500 holders of Allowed Claims; and more than 9.56 billion freely tradeable CVV Interests have been distributed to more than 8,000 holders of Allowed Claims and more than 23,000 holders of Equity Interests.[7] Those who have received TWC shares or CVV Interests have since been free to sell, encumber, or otherwise dispose of those shares or CVV Interests.

---

"somewhere between 250 and 500 million [dollars]"), 27 (suggesting a bond "in the range of 250 million dollars").

[7] *See* Plan Proponents' Memorandum of Law in Response to Appellant's Brief on Mootness ("Appellees' Mootness Mem."), at 4-5.

## II.   LEGAL STANDARD

### A.   Appeals of Bankruptcy Court Orders

#### 1.   Final Order

The district courts are vested with appellate jurisdiction over

bankruptcy court rulings.[8]  Final orders of the bankruptcy court may be appealed

to the district court as of right.[9]  An order is final if "[n]othing in the order . . .

indicates any anticipation that the decision will be reconsidered."[10]  Courts have

held that an order confirming a plan of reorganization is final.[11]

#### 2.   Standard of Review

A district court functions as an appellate court in reviewing

judgments rendered by bankruptcy courts.[12]  Findings of fact are reviewed for

---

[8]     See 28 U.S.C. § 158(a).

[9]     See id. § 158(a)(1).

[10]    In re Palm Coast, Matanza Shores Ltd. P'Ship, 101 F.3d 253, 256 (2d Cir. 1996).

[11]    See In re Worldcom, Inc., No. M47, 2003 WL 21498904, at *5 (S.D.N.Y. June 30, 2003).  The parties do not dispute that the Bankruptcy Court's Confirmation Order is final.

[12]    See In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

-6-

clear error.[13]  A finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been committed.'"[14]  A bankruptcy court's conclusions of law, by contrast, are reviewed de novo.[15]

### B.     Judicial Estoppel

"The equitable doctrine of judicial estoppel provides that, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because [its] interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by [it].'"[16]  A litigant who asserts judicial estoppel must establish that "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some

---

[13]     *See* Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003).

[14]     *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[15]     *See In re Cody*, 338 F.3d at 94; *In re 139-141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y. 2004) (same).

[16]     *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 147 (2d Cir. 2005) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

manner."[17]  Moreover, application of judicial estoppel is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."[18]

### C.    Mootness

The Second Circuit has held that "when, during the pendency of an appeal, events occur that would prevent the appellate court from fashioning effective relief, the appeal should be dismissed as moot."[19]  Mootness in that context refers to constitutional mootness, the Article III prudential doctrine that requires that only live cases or controversies be heard by the courts.[20]  In the bankruptcy context, however, the broader doctrine of equitable mootness has evolved in appeals of confirmation orders.  The equitable mootness doctrine furthers the principle that "the ability to achieve finality is essential to the fashioning of effective remedies."[21]  Under the doctrine of equitable mootness, an

---

[17]    *United States v. Hussein*, 178 F.3d 125, 130 (2d Cir. 1999).

[18]    *Uzdavines*, 418 F.3d at 147.

[19]    *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay I")*, 988 F.2d 322, 325 (2d Cir. 1993).

[20]    Constitutional mootness is not at issue on this appeal.

[21]    *Chateaugay I*, 988 F.2d at 325.

appeal should be dismissed when, "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."[22] "Completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."[23]

### 1. Presumption of Equitable Mootness upon Substantial Consummation

Equitable mootness of an appeal of a bankruptcy court order confirming a plan of reorganization under chapter 11 is presumed when the reorganization plan has been substantially consummated during the pendency of the appeal.[24] The Code defines substantial consummation as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the

---

[22]     *Id.* (stating that principles of mootness are "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies"). *Accord In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005).

[23]     *Chateaugay I*, 988 F.2d at 326.

[24]     *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay III")*, 94 F.3d 772, 776 (2d Cir. 1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization.").

business or of the management of all or substantially all of the property dealt with

by the plan; and (C) commencement of distribution under the plan."[25]

### 2.    Rebutting the Presumption of Equitable Mootness

The presumption of mootness may be rebutted, but only upon a

showing of the following:

> (a) the court can still order some effective relief; (b) such relief
> will not affect the re-emergence of the debtor as a revitalized
> corporate entity; (c) such relief will not unravel intricate
> transactions so as to knock the props out from under the
> authorization for every transaction that has taken place and create
> an unmanageable, uncontrollable situation for the Bankruptcy
> Court; (d) the parties who would be adversely affected by the
> modification have notice of the appeal and an opportunity to
> participate in the proceedings; and (e) the appellant pursue[d]
> with diligence all available remedies to obtain a stay of execution
> of the objectionable order . . . if the failure to do so creates a
> situation rendering it inequitable to reverse the orders appealed
> from.[26]

An appellant faced with the presumption of mootness due to substantial

consummation "must demonstrate *each* of five factors set forth in [*Chateaugay*

---

[25]    11 U.S.C. § 1101(2).  Substantial consummation precludes
modification of a plan.  *See id.* § 1127.

[26]    *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*
*("Chateaugay II")*, 10 F.3d 944, 952-53 (2d Cir. 1993) (citations and quotations
omitted).

*II*]."[27]

## III.  DISCUSSION

### A.  Judicial Estoppel

Appellees assert that Appellants should be judicially estopped from asserting that the appeal is not equitably moot because Appellants' position on the stay application was that the stay was necessary mainly because equitable mootness was a near certainty.  Appellants argued at every turn that the stay was necessary to protect their right to appeal because without a stay they would lose their appellate rights due to the grave risk of equitable mootness.  Indeed, the factor that weighed most heavily in favor of the Court's granting of Appellants' application for a stay pending appeal was Appellants' assertion of irreparable harm stemming from equitable mootness.  In briefing to the Second Circuit, Appellants again asserted that a stay was necessary because failing to grant a stay would "'eliminate appellate review.'"[28]

---

[27]    *In re Loral Space & Commc'ns Ltd.*, 346 B.R. 71, 72 (S.D.N.Y. 2006) (emphasis added).  *Accord Chateaugay II*, 10 F.3d at 952 ("[S]ubstantial consummation will not moot an appeal if *all of the following [five] circumstances exist* . . . ." (emphasis added)); *In re Kenwin Shops, Inc.*, No. 99 Civ. 10485, 2000 WL 351404, at *2 (S.D.N.Y. Apr. 5, 2000) (appellant "must show that each of the five *Chateaugay* factors supports maintaining its appeal.").

[28]    Appellees' Mootness Mem. at 3 (quoting Appellants' Second Circuit Emergency Motion Memorandum of Law, at 21).  *See also id.* (quoting

Moreover, even after the Court granted the stay and Appellants returned to the Court to seek a modification of the bond, Appellants continued to insist that they were "asking to avoid mootness."[29] As it turned out, however, Appellants did not want the stay badly enough to risk anything other than a trivial bond relative to the potential harm to the estate that could result from the stay. Indeed, by the end of that hearing, Appellants conceded that they no longer sought a stay.

Appellants now claim that the appeal is not equitably moot. But the only thing that has changed since Appellants' repeated threats that they will lose their appellate rights in the absence of a stay — besides the Plan taking effect — is that Appellants' interests have changed. Specifically, Appellants initially argued that they were entitled to a stay with little or no bond based on the grave threat of mootness and lack of appellate review, but now, after that strategy has failed, Appellants argue that their appeal is not moot after all. The very purpose of judicial estoppel is to prevent a party from taking such inconsistent positions merely because that party's interests have changed.

---

Appellants' Brief in Support of Stay Pending Mandamus Petition, at 31, as stating that the absence of a stay would prevent Appellants from having "an effective opportunity for appellate review").

[29]   2/12/07 Tr. at 8.

-12-

Both elements of judicial estoppel are satisfied here. *First*, during the stay application proceeding, Appellants advanced the position that their appeal would be equitably moot if the Plan were permitted to go forward,[30] which is inconsistent with their position in the present appeal. *Second*, the Court adopted Appellants' position at the stay proceeding and found that equitable mootness, and equitable mootness alone, would constitute irreparable harm sufficient to outweigh the harm to the Appellees and the estate such that a stay would be proper.[31]

Moreover, all of the arguments that Appellants now raise on appeal could have been, and should have been, raised on the stay application, especially given that the Court invited the parties to address whether the Plan could go effective without resulting in equitable mootness. If Appellants had made the arguments then that they make now, the three-week delay in the effective date of

---

[30]     The mere fact that Appellants attempted to reserve their right to argue that the appeal is not moot if the stay were not granted does not save them here. The stay *was* granted; they just chose not to comply with the bond condition or to negotiate a realistic modification of that condition. Appellants cannot seriously claim that they did not argue to the Court that equitable mootness was for all intents and purposes a certainty.

[31]     The stay proceeding was a separate and independent proceeding from the present appeal. Thus, this is not an instance where a party is pleading in the alternative, as Appellants suggest. *See* Reply Brief of Appellants in Opposition to Claims of Mootness and Equitable Mootness ("Appellants' Mootness Reply"), at 10.

-13-

the Plan might have been avoided.[32]  Appellants' inconsistent positions have had

an impact on judicial integrity and have prejudiced Appellees.[33]  Thus, the appeal

should be dismissed as equitably moot on judicial estoppel grounds alone.[34]

## B.   Equitable Mootness

Even if Appellants were not judicially estopped from denying the

equitable mootness of this appeal, I conclude that the appeal is equitably moot.

Appellees argue that the Plan has been substantially consummated, cataloging all

of the steps that have been taken since the stay was lifted and the Plan went

effective.  Appellants do not (and could not) dispute that the Plan has been

substantially consummated.  Accordingly, the *Chateaugay* presumption of

---

[32]      This three-week delay caused tangible, and far less than trivial, harm
to Appellees and the estate in terms of the accrual of interest on debt, which was
estimated to accrue at $2.4 million per day, *see In re Adelphia Commc'ns Corp.*,
2007 WL 186796, at *7, for a total amount of over $50 million, as well as the
accrual of professional fees and expenses, *see id.*

[33]      I have little doubt that Appellants used the Court to obtain bargaining
leverage to extract a better deal for their clients with no intention of ever posting a
reasonable bond.  Such behavior is cynical at best and unprincipled at worst.

[34]      Judicial estoppel seems particularly well-suited to apply here because
the issue raised in this appeal is one of equity, where the Court's inquiry is
whether it would be equitable, as opposed to merely possible, to afford relief to
Appellants despite substantial consummation of the Plan.  Under the
circumstances of this case, it is not equitable to permit Appellants to obtain the
benefits of their inconsistent positions to the detriment of Appellees and all other
creditors.

-14-

mootness applies, and this appeal must be dismissed unless Appellants can rebut

that presumption by demonstrating that each of the five *Chateaugay* factors

supports permitting this appeal to be heard on the merits.[35]  As discussed below,

Appellants fail to meet their burden on four of the five *Chateaugay* factors.[36]

### 1.    Whether Effective Relief Can Be Granted

When the Court addressed Appellants' application for a stay pending

appeal, it requested letter briefs on the issue of whether a disgorgement remedy

would be feasible upon the hypothetical reversal of an unstayed confirmation

order.  In support of disgorgement, Appellants stated that disgorgement is

"[w]orkable with [p]rotections," and cited to a single chapter 11 case where the

bankruptcy court permitted approximately $213 million in disputed funds to be

---

[35]     *See Chateaugay II*, 10 F.3d at 952.

[36]     Appellants' overarching theme is that their appeal is not equitably
moot because the "court can fashion some form of meaningful relief."  Brief of
Appellants in Opposition to Claims of Mootness and Equitable Mootness
("Appellants' Mootness Mem."), at 10.  That is not the standard.  Appellants quote
a Third Circuit decision that "'even if [such relief] only partially redresses the
grievances of the prevailing party, the appeal is not moot.'"  *Id.* (quoting *In re
Continental Airlines*, 91 F.3d 553, 558 (3d Cir. 1996) (en banc)).  A close reading
of that decision, however, reveals that Appellants have "fallen into the trap" of
confusing equitable and constitutional mootness.  *In re Continental Airlines*, 91
F.2d at 559.  The quote used by Appellants was taken from the court's discussion
of constitutional mootness, not equitable mootness.  *See id.* at 558.  Constitutional
mootness, however, has never been an issue in this case.

distributed to holders of notes, subject to disgorgement.[37]  In opposition, Appellees

argued that notwithstanding the "array of novel and complex" jurisdictional and

practical questions raised by the idea of disgorging distributions, once the

estimated 111 million shares of freely tradeable TWC Stock are distributed to

14,000 parties, and the estimated 9.4 billion CVV Interests and $7.136 billion in

cash are distributed to over 10,000 parties, disgorgement becomes, for all intents

and purposes, impossible.[38]

On appeal, Appellants maintain that effective relief can be granted in

either of two ways.  Appellants argue that the MIA Litigation could be permitted

to proceed to judgment or settlement and that the Court, *ex post*, could order

disgorgement of Plan distributions from creditors who had received in excess of

the amount that they are entitled to receive pursuant to such judgment or

settlement.[39]  In the alternative, the Court, *ex ante*, could order "the immediate

---

[37]      1/19/07 Letter from Martin J. Bienenstock at 2-3 (citing *In re Kaiser
Aluminum Corp.*, No. 02-10429 (Bankr. D. Del. Mar. 3, 2006) (Docket No. 8370)
(requiring each noteholder receiving a distribution to execute an affidavit agreeing
to return all distributions within thirty days after notification of the entry of a final
order reversing the distribution on appeal)).

[38]      1/19/07 Letter from Marc Abrams and Adam L. Shiff, counsel to the
Debtors and the Creditors Committee, respectively, at 1.

[39]      *See* Appellants' Mootness Mem. at 6.

return of disputed distributions (or their equivalent value if transferred) from ACC creditors, Arahova noteholders, and any other creditors whose distributions are seriously contested" pending the outcome of the MIA Litigation.[40]

Appellees argue, much like they did in opposing the stay, that disgorgement is not feasible.  They argue that a substantial portion of the billions of dollars in cash, TWC stock and CVV Interests that have been distributed to tens of thousands of distributees was distributed through intermediaries, and that the "actual identities of nearly all of the true stakeholders are not even known (and are confidential unless they consent to their disclosure)."[41]  Moreover, it is likely that the distributions have changed hands several times since the Plan has gone effective.

Appellants claim that disgorgement is an available remedy based on the following four arguments.  *First*, they argue that the facts that Debtors were able to transmit ballots to creditors and that the ballots were returned "show[] that the parties can locate the beneficial holders who received ballots or distributions

---

[40]    *Id.* Interestingly, when the parties were before the Court on the stay application, Appellants (who are ACC creditors) scoffed at the idea of pledging any of their distributions to satisfy a bond requirement. If they had made this offer then, they may very well have avoided the entire mootness problem.

[41]    Appellees' Mootness Mem. at 9.

and serve them with orders of disgorgement."[42]  *Second*, they claim that Debtors

"still hold massive quantities of cash and other consideration."[43]  *Third*, Appellants

argue that the Court can "nullify improperly granted releases and exculpation."[44]

*Fourth*, they assert that the "major holders of Arahova and ACC notes are not only

on notice here, they are active participants in the appeal, and all other creditors can

be given notice."[45]  None of these assertions withstands scrutiny.

　　　　　With respect to the first assertion, for example, Appellees explain

that, much like the distributions, the solicitation of votes of beneficial holders was

done through intermediaries and that the majority of those beneficial holders are

unknown and confidential.  Moreover, the solicitation process was completed

several months before confirmation and thus, many of those holders could have

liquidated or transferred their ownership in the interim.

　　　　　Appellants' fourth assertion that disgorgement "is fully within this

Court's authority" because "most of the substantial holders of Arahova and ACC

---

[42]　　　Appellants' Mootness Mem. at 7-8.

[43]　　　*Id.* at 8.

[44]　　　*Id.*

[45]　　　*Id.*

notes are already participants in this appeal"[46] serves only to highlight one of the

pervading flaws in Appellants' position.  Appellants consistently assert that the

Inter-Creditor Dispute is a zero-sum game between two groups:  the ACC

Noteholders and the Arahova Noteholders.  However, as Appellees point out, that

is simply not the case, as demonstrated by the fact that various other classes of

creditors agreed to a total of well over one billion dollars in give-ups under the

Plan to settle the Inter-Creditor Dispute.[47]  Indeed, Appellees argue that if there

were truly only two groups involved in the Inter-Creditor Dispute, there would

have been no incentive for the other creditors to opt into the resolution process.[48]

Moreover, despite Appellants' conclusory assertion of the availability

of disgorgement, Appellants do not explain how disgorgement would work in

practice, other than an additional conclusory assertion that ordering disgorgement

"will require postage or email, not rocket science."[49]  The various attempts to

---

[46]     *Id.* at 7.

[47]     *See* Appellees' Mootness Mem. at 13.

[48]     Appellants' alternative argument on their fourth assertion that
disgorgement is within the Court's authority because "all creditors can be given
notice of the appeal," Appellants' Mootness Mem. at 7, is unsupported, as more
fully discussed below. *See infra* Part III.B.4.

[49]     Appellants' Mootness Mem. at 8.  By contrast, Appellees raise
several questions regarding how disgorgement would be effected.  For example,
they point out that Appellants never established that the court would have

-19-

oversimplify this case highlight its complexities.[50]  In short, it is far from evident that an effective remedy can still be granted in this case.

### 2.    Whether Such Relief Will Negatively Affect Re-emergence of the Debtor

The parties do not dispute that Debtors have been liquidated and effectively cease to exist.  As a result, the second *Chateaugay* factor is inapposite.

---

jurisdiction over creditors who have received an unencumbered distribution under the Plan.  *See* Appellees' Mootness Mem. at 11 & n.10.  Appellants themselves raised this concern in the January 19, 2007 letter briefing on disgorgement, stating that there may be a question of whether creditors, once they received the distributions under the plan, are still subject to the court's subject matter jurisdiction.  *See* 1/19/07 Letter from Martin J. Bienenstock at 1.  That such questions remain unanswered lends support to the conclusion that disgorgement is not a realistic remedy in this case.

[50]      As another example, Appellants attempt to cast this multi-billion dollar plan of reorganization that includes a global settlement, and distributions of cash, stock and interests in a litigation vehicle as a mere "reallocation of discrete assets."  Appellants' Mootness Mem. at 9.  Appellants cite *Mission Iowa Wind Co. v. Enron Corp. (In re Enron Corp.)*, 291 B.R. 39 (S.D.N.Y. 2003), for the proposition that appeals in cases involving reallocation of discrete assets are not moot even in the absence of a stay.  *See* Appellants' Mootness Mem. at 9; Appellants' Mootness Reply at 2.  However, *Mission Iowa* involved an asset sale, which the court itself distinguished from a confirmation of a plan of reorganization, and did not involve any issue of equitable mootness; indeed, *Chateaugay* was never mentioned.  Rather, the court analyzed whether the bankruptcy court would lose jurisdiction as a result of the asset sale thus rendering the appeal moot.  This case is inapposite here.

### 3.   Whether Such Relief Will Unravel Intricate Transactions

Even if disgorgement were available as effective relief in this case, such relief would be inequitable because it would "unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court."[51] A Global Settlement was reached and implemented. Billions of dollars were distributed in cash, TWC stock and CVV Interests. Thousands of creditors have undoubtedly entered into countless transactions with their distributions since the Plan went effective. The TWC stock went public without an IPO in reliance on the section 1145 exemption in the Plan. The Government Restitution Fund was established. These transactions cannot be unraveled, nor would it be equitable to unravel them to provide Appellants relief on this appeal.

Appellants do not explain why the Court should order selective disgorgement from cherry-picked creditors as opposed to ordering disgorgement from all creditors (assuming such relief were available), nor do they explain how the Court could do so. Appellees argue, persuasively, that such relief would rewrite the terms of the bargain, which is beyond the power of the Court.

---

[51]    *Chateaugay II*, 10 F.3d at 953.

-21-

Moreover, to order disgorgement from a select few creditors is inequitable because those creditors would not be able to recoup their losses by pursuing other creditors as they agreed to relinquish those claims as part of the Global Settlement.  Thus, the only way to permit disgorgement is to dissolve the Global Settlement, which surely would "knock the props out from under the authorization for every transaction that has taken place"[52] under the Plan.  Ordering disgorgement, even if feasible (which is doubtful), would cause the unraveling of the Plan, and thus, Appellants fail to satisfy the third *Chateaugay* factor.

### 4.      Whether Parties Adversely Affected Have Had Notice and Opportunity to Participate in the Appeal

Appellants argue that they have satisfied the fourth *Chateaugay* factor based on the following:  (1) they have sought to provide potentially affected parties with notice of the appeal and the relief sought and that they "have named all known potentially affected parties as Appellees"; (2)"[a]ll distributees can be given written notice of potential disgorgement"; and (3) "the wire services ran stories that notified all creditors that their distributions may be subject to disgorgement."[53]  Further, they argue, the press coverage of the confirmation

---

[52]      *Id.*

[53]      Appellants' Mootness Mem. at 11-12.

hearing and stay litigation provides "constructive notice" to potentially affected parties.[54]

Appellees counter that no notice of a risk of disgorgement has been provided.[55]  Indeed, Appellants requested several times that the Bankruptcy Court, this Court or the Second Circuit provide notice to all creditors of possible disgorgement but those requests were refused.[56]  Moreover, the Confirmation Order provided that creditors could keep what they received and that many of the distributees have undoubtedly entered into transactions in reliance on that provision.[57]  Further, they argue that even if all potentially affected creditors were

---

[54]   *Id.*

[55]   *See* Appellees' Mootness Mem. at 17-18.

[56]   *See id.* at 18.

[57]   *See* Bankruptcy Court's Order Confirming First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors, ¶ 57, which provides:

> Subject to applicable law, if any or all of the provisions of this Order are hereafter reversed, modified or vacated . . . such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Proponents' receipt of written notice of any such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the

-23-

given adequate notice, not all of them are parties to the appeal and it would be impracticable for all of them to participate in the appeal.[58]

I find that Appellees' arguments are persuasive on this point.  In each case relied upon by Appellants, the "relevant parties" were before the Court.[59] That is not the situation here.  As discussed above, the only equitable implementation of a disgorgement remedy would be to order disgorgement from all affected creditors, not merely from the select few designated by Appellants. Thus, all creditors are potentially at risk and should be parties.  Appellants fail to explain how and why all of those creditors — each of whom received unencumbered distributions under the Plan and very well may no longer be within the reach of the Court's jurisdiction[60] — are sufficiently on notice that their distributions are vulnerable to disgorgement on appeal.[61]  Indeed, that was one of the concerns expressed by the court in *Chateaugay I*, where the Second Circuit

---

provisions of this Order and the Plan . . . .

[58]     *See* Appellees' Mootness Mem. at 18 n.18 (citing *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 890 (S.D.N.Y. 1994)).

[59]     Appellants' Mootness Mem. at 12.

[60]     *See supra* Part III.B.1.

[61]     The Court declines Appellants' invitation to fix the notice deficiencies by undertaking to provide all creditors with notice of the appeal. *See* Appellants' Mootness Mem. at 12.

stated that "[c]ompleted acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."[62]

### 5.    Whether Appellants Pursued a Stay with Diligence

Appellants did seek a stay in this Court pending their appeal of the Confirmation Order.  This Court granted the stay, but conditioned it upon Appellants' posting of a substantial bond.  Although the Court set the bond at $1.3 billion, Appellants were given numerous opportunities — before this Court, before the Second Circuit, and once again before this Court — to offer an alternative bond amount, so long as that amount was substantial and reflected the grave harm that the estate stood to suffer as a result of the stay during the pendency of an appeal.  Appellants' only offer was $10 million, which amounted to a complete refusal to post a reasonable bond.

Refusal to post a bond that a court requires as a condition to obtaining a stay pending appeal constitutes a "failure to seek a stay diligently" under the fifth *Chateaugay* factor.[63]  A significant bond in this case was necessary in order

---

[62]    988 F.2d at 326.

[63]    *In re National Rests. Mgmt., Inc.*, Nos. 00 Civ. 6624, 00 Civ. 6625, 2001 WL 220023, at *5 (S.D.N.Y. Mar. 7, 2001).

to protect the estate and third parties in the event of an unsuccessful appeal.[64]
Again, it is important to note that Appellants never attempted to demonstrate that
they were "unable (rather than unwilling)"[65] to post a reasonably substantial bond.
Rather, they simply did not view it as a prudent investment.  But their business
decision not to post a bond — even a substantially reduced bond on the order of
$250 million, which represents Appellants' potential upside — was made at their
peril.  To permit a party to avoid mootness merely by pursuing a stay that they
never intended to bond would be grossly inequitable and would swallow the fifth
*Chateaugay* factor.  Thus, the fifth factor favors dismissal of this appeal on
mootness grounds.

   In sum, Appellants fail to establish four of the five *Chateaugay*
factors and thus, cannot overcome the presumption of equitable mootness
stemming from substantial consummation of the Plan.  Even apart from the precise
application of each of the *Chateaugay* factors in this case, the essence of the
equitable mootness doctrine is to prevent appeals from going forward in cases
where granting relief, even where hypothetically possible, would be inequitable.
This is one of those cases.  Accordingly, this appeal of the Confirmation Order

---

[64]  *See In re Adelphia Commc'ns Corp.*, 2007 WL 186796, at *18.

[65]  *In re Adelphia Commc'ns Corp.*, slip op. at 4.

must be dismissed as moot.[66]

## IV.   CONCLUSION

For the reasons discussed above, the appeal is dismissed as equitably

moot.  The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              April 2, 2007

_____

[66]        The Bankruptcy Court predicted this very result.  *See* Bench Dec. at
253 (analyzing the irreparable harm to the moving party factor:  "I assume it to be
true that if a stay isn't granted, the Plan will go effective, and that if that happens,
there is a very high probability that any appellate court would then find an appeal
to be moot.").

## - Appearances -

**For Appellants:**

WEIL, GOTSHAL & MANGES LLP
Counsel for the ACC Bondholder Group
767 Fifth Avenue
New York, NY  10153
By:     Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
        Richard W. Slack, Esq.
        Vernon S. Broderick, Esq.

700 Louisiana, Suite 1600
Houston, Texas 77002
By:     Melanie Gray, Esq.
        Sylvia Mayer, Esq.

STUTMAN, TREISTER & GLATT P.C.
Co-Counsel for the ACC Bondholder Group
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
By:     Isaac M. Pachulski, Esq.
        Stephan M. Ray, Esq.

**For Appellees:**

WILLKIE FARR & GALLAGHER LLP
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:     Marc Abrams, Esq.
        Brian E. O'Connor, Esq.
        Roger D. Netzer, Esq.
        Paul V. Shalhoub, Esq.
        Terence K. McLaughlin, Esq.

-28-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY 10019
By:   David M. Friedman, Esq.
       Adam L. Shiff, Esq.
       Michael C. Harwood, Esq.


**Other Parties:**

MORGENSTERN JACOBS & BLUE LLC
Counsel for Official Committee of Equity Security Holders
885 Third Avenue
New York, NY 10022
By:   Gregory A. Blue, Esq.
       Eric B. Fisher, Esq.


SHEPPARD MULLIN RICHTER & HAMPTON LLP
Counsel for U.S. Bank National Association, as Indenture Trustee in Respect of
the Arahova Notes
333 South Hope Street, 48th Floor
Los Angeles, CA 90071
By:   Metter H. Kurth,  Esq.

SEWARD & KISSEL LLP
Counsel for Law Debenture Trust Company of New York, as ACC Senior Notes
Trustee
One Battery Park Plaza
New York, NY 10004
By:   Arlene R. Alves, Esq.

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036
By:   J. Christopher Shore, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10036
By:    Gary L. Kaplan, Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A., as Administrative Agent for the Century
Cable Lenders
153 East 53rd Street, Suite 4900
New York, NY  10022
By:    Robin E. Phelan, Esq.
           Judith Elkin, Esq.

BRACEWELL & GIULIANI, LLP
Counsel for the Ad Hoc Committee of Non-Agent TCI and Parnassos Lenders
1177 Avenue of the Americas
New York, NY 10036
By:    Jennifer Feldcher, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders
425 Lexington Avenue
New York, NY 10017
By:    Peter Pantaleo, Esq.
           Elisha D. Graff, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Bank of Montreal, as Administrative Agent for the Olympus Lenders
1675 Broadway, Suite 1900
New York, NY 10019
By:    Kenneth E. Noble, Esq.

GOODWIN PROCTER LLP
Counsel for Highfields Capital Management and Tudor Investment Corporation
901 New York Avenue

Washington, D.C. 20001
By:    Michael K. Isenman, Esq.
53 State Street, Exchange Place
Boston, MA 02109
By:    Gina Lynn Martin, Esq.
599 Lexington Avenue
New York, NY 10022
By:    Allan S. Brilliant, Esq.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB LLP
Counsel for Ad Hoc Bondholders' Committee (a/k/a Committee II)
780 Third Avenue, 36th Floor
New York, NY 10017
By:    Dean Ziehl, Esq.
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067
By:    Richard Pachulski, Esq.

CLIFFORD CHANCE US LLP
Counsel for Calyon New York Branch
31 West 52nd Street
New York, NY 10019
By:    Andrew Brozman, Esq.
       James Moyle, Esq.

CLIFFORD CHANCE US LLP
Counsel for Bank of N.Y.
31 West 52nd Street
New York, NY 10019
By:    Angelique Shingler, Esq.

CADWALADER WICKERSHAM & TAFT LLP
Counsel for Perry Capital, LLC
One World Financial Center
New York, NY 10281
By:    Kathryn L. Turner, Esq.

SIDLEY AUSTIN LLP
Counsel for the Fort Myers Noteholders
787 Seventh Avenue
New York, NY 10019
By:   Lee S. Attanasio, Esq.

ROPES & GRAY, LLP
Counsel for Satellite Asset Management, L.P.
25 Rockefeller Plaza
New York, NY 10111
By:   David Elkind, Esq.

SCHULTE ROTH & ZABEL
Counsel to Och Ziff Capital Management and Chesapeake
919 Third Avenue
New York, NY 10022
By:   Adam C. Harris, Esq.

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Counsel for the Class Action Plaintiffs
460 Park Avenue, 8th Floor
New York, NY 10022
By:   John H. Drucker, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Counsel for the FrontierVision Ad Hoc Committee
1177 Avenue of the Americas
New York, NY 10036
By:   Kenneth H. Eckstein, Esq.
       Jeffrey S. Trachtman, Esq.

LATHAM & WATKINS LLP
Counsel to the Olympus Noteholders Committee
886 Third Avenue, Suite 1000
New York, NY 10022
By:   Robert J. Rosenberg, Esq.

-32-

MILBANK, TWEED, HADLEY & MC CLOY LLP
Counsel for JPMorgan Chase Bank
One Chase Manhattan Plaza
New York, NY 10005
By:    James C. Tecce, Esq.

KIRKLAND & ELLIS LLP
Counsel for Ad Hoc Committee of Lenders
777 South Figueroa Street
Los Angeles, CA 90017
By:    Richard L. Wynne, Esq.
       Michael I. Gottfried, Esq.

CLEARY, GOTTLIEB, STEEN & HAMILTON
Counsel for Certain Investment Banks
One Liberty Plaza
New York, NY 10006
By:    Lindsee P. Granfield, Esq.
       Luke A Barefoot, Esq.
       Jane Kim, Esq.

SATTERLEE, STEPHENS, BURKE & BURKE, LLP
Counsel for Prestige Communications
230 Park Avenue
New York, NY 10169
By:    Christopher R. Belmonte, Esq.

SHEARMAN & STERLING, LLP
Counsel for Rembrandt Technologies, L.P.
 599 Lexington Avenue
New York, NY 10022
By:    Marc B. Hankin, Esq.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281
By:    Patricia Schrage, Esq.

-33-

KLEINBERG, KAPLAN, WOLFF & COHEN, PC
Counsel for Elliot Associates, LP and John Pike
551 Fifth Avenue
New York, NY 10176
By:    David Parker, Esq.

KELLEY, DRYE & WARREN, LLP
Counsel for Wilmington Trust Co.
200 Kimball Drive
Parsippany, NJ 07054
By:    Geoffrey W. Castello, Esq.

DORSEY & WHITNEY, LLP
Counsel for U.S. Bank, N.A., as Indenture Trustee
50 South Sixth Street
Minneapolis, Minnesota 55402
By:    Katherine A. Constantine, Esq.

WILMER, CUTLER, PICKERING, HALE & DORR, LLP
Counsel for  Credit Suisse and Royal Bank of Scotland
300 Park Avenue
New York, NY 10022
By:    Joel Millar, Esq.

LUSKIN, TERN & EISLER, LLP
Counsel for The Bank of Nova Scotia
330 Madison Avenue
New York, NY 10017
By:    Michael Luskin, Esq.

FARRELL FRITZ, P.C.
Counsel for Associated Electric & Gas
1320 Reckson Plaza
Uniondale, NY 11556
By:    Louis A. Scarcella, Esq.

BROWN RUDNICK BERLACK ISRAELS, LLP
Counsel for the Ad Hoc Adelphia Trade Claims Committee and Ad Hoc
Committee of Holding Company Trade Claims
One Financial Center
Boston, MA 02111
By:    Steven D. Pohl, Esq.

BAKER BOTTS, LLP
Counsel for Verizon Media Ventures
2001 Ross Avenue
Dallas, TX 75201
By:    Eric Soderlund, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, Suite 2100
New York, NY 10004
By:    Tracey Hope Davis, Esq.